1
2
3
4
5
6
7
8
9
10
11
12
13
14

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

LINDA ANN MILEY,

                        Petitioner,          Case No. C06-1512-MJP-JPD

        v.

JANE PARNELL,                                REPORT AND RECOMMENDATION

                        Respondent.

15

INTRODUCTION AND SUMMARY CONCLUSION

16    Petitioner is a state prisoner who is currently confined at the Washington Corrections

17 Center for Women in Gig Harbor, Washington.  She seeks relief under 28 U.S.C. § 2254 from

18 her 2001 Island County Superior Court conviction.  This matter is now before the Court on

19 petitioner's second amended petition for writ of habeas corpus.  Respondent has filed an answer

20 to the second amended petition and has submitted relevant portions of the state court record.

21 Petitioner has filed a response to respondent's answer.  This Court, having carefully reviewed the

22 petition, the briefs of the parties, and the state court record, concludes that petitioner's federal

23 habeas petition should be denied and this action should be dismissed with prejudice.

REPORT AND RECOMMENDATION - 1

The conviction which petitioner seeks to challenge in the instant habeas action arises out of the 1997 shooting death of her companion, Jack Pearson. The shooting occurred in the early morning hours of December 19, 1997, in the Camano Island home Pearson had shared with petitioner for the preceding six years. Police were first alerted to the shooting by a neighbor, Karen Bradford, to whose home petitioner fled following the incident. (*See* Dkt. No. 74, Ex. 50 at 33 and Ex. 56 at 1116.) When petitioner arrived at the Bradford residence, she reported to Mrs. Bradford that Pearson had been hurt, that there was a masked intruder, and that petitioner had heard a gunshot. (*Id.*, Ex. 50 at 31.) When officers arrived at the house, they discovered Pearson's body lying on the floor near the kitchen. (*Id.*, Ex. 50 at 75.) However, a security search of the house revealed no suspects. (*See id.*, Ex. 50 at 86.)

As police were beginning their investigation, police and medical personnel contacted petitioner at the Bradford house where they found her distraught and hysterical. (*See id.*, Ex. 50 at 115-16, 123-24.) Petitioner, though largely incoherent, managed to tell the EMTs and police that she had been upstairs playing a computer game when she heard a noise and looked down the stairs where she saw a masked intruder standing at the bottom of the stairs. (*Id.*, Ex. 50 at 117-18, 124-26.) Petitioner also made mention of her ex-husband and commented in the presence of the EMTs and police that her ex-husband "had a contract on her." (*Id.*, Ex. 50 at 119, 127.) While petitioner did not appear to have any physical injuries, the EMTs did point out to police that petitioner had small spots on her shirt that appeared to be dried blood. (*Id.*, Ex. 50 at 129.)

Petitioner remained largely uncommunicative in the hours following the incident and a decision was therefore made to transport her, by ambulance, from the Bradford residence to Skagit Valley Hospital where she stayed for several days under the care of a psychiatrist. (*See*

REPORT AND RECOMMENDATION - 2

Dkt. No. 74, Ex. 51 at 272-75.)  Two days after the incident, petitioner's psychiatrist cleared petitioner to be interviewed by police.  (*Id*., Ex. 51 at 284-85.)  At that time, petitioner told police that she had been upstairs asleep when something woke her.  (*Id*., Ex. 51 at 291.)  She said that she went downstairs and walked toward the kitchen where she saw Pearson and another individual struggling.  (*Id*., Ex. 51 at 291.)  Petitioner described the other individual as a small male, no bigger than her, who was wearing a ski mask and gloves, and was holding a gun.  (*Id*., Ex. 51 at 291-92.)  Petitioner said that she attempted to intervene by grabbing the man's arm, but the gun went off.  (*Id*., Ex. 51 at 292.)  Petitioner indicated that she was unable to recall much of what happened after the gun went off.  (*See id*.)

On January 2, 1998, police conducted a walk-through of the crime scene with petitioner in hopes that it would jog petitioner's memory about what had happened the night of the shooting.  (*Id*., Ex. 51 at 298-99.)  Prior to the walk-through, petitioner advised police that there might be money in a closet in one of the bedrooms which she had apparently hidden there on the night of the shooting.  (*See id*., Ex. 51 at 323-24.)  During the walk-through, petitioner identified the box where she had hidden money and police subsequently recovered $19,500 from the box.  (*Id*., Ex. 51 at 304-05.)  Petitioner also made a comment during the walk-through that she recalled that the subject who had been engaged in the altercation with Pearson was wearing surgical shoe coverings.  (*Id*., Ex. 52 at 371.)  That comment, which struck police as "over the top," caused them to consider petitioner as a potential suspect rather than just a co-victim/witness to the crime.  (*Id*., Ex. 52 at 371-72.)

On January 14, 1998, police conducted their first suspect interview with petitioner at the Oak Harbor Police Station.  (*Id*., Ex. 52 at 372-74, 479-80.)  When petitioner was first asked to describe the events of December 19th, she once again offered the story of the intruder.  (*Id*., Ex.

52 at 494.) The interviewing detective then asked petitioner a series of questions concerning inconsistencies between the physical evidence at the scene of the crime and her story regarding the masked intruder. (Dkt. No. 74, Ex. 52 at 497-98.) Petitioner responded that everything she had told the detective up to that point had come to her in dreams. (*Id*.)

After taking a break, petitioner returned to the interview room and told the detective, without any question being posed, that she would never hurt anyone and that she was not a bad person. (*Id*., Ex. 52 at 499-500.). Petitioner then volunteered the following:

> I'm trying to think of the worst case scenario that could make a person do that. Hypothetically thinking, worst scenario, after all I did, and the fact that he was responsible for my back injury, herpes, and he said that he wanted to spend the rest of his life with me, hypothetically, if he told me I had to get out of the house and get out of the house now and if he took papers that showed that he owed me money for back wages and a list of assets, if he took them and threw them in the fire and said, not only are you going to get out, but you're going to get out now, or I will hurt you, hypothetically . . ."

(Dkt. No. 74, Ex. 52 at 500.)

After offering that "hypothetical," petitioner paused for a period of time, and when the detective prompted her to continue, she offered the following:

> Hypothetically, he picks you up and said he would take you to the bedroom to do what he did that morning because it gave him such pleasure, would you pick up something and hit him? He became so enraged, he came after you, possibly to kill you, could that make a person do something that they would not normally do?

(*Id*., Ex. 52 at 502.)

As the interview progressed, a new version of the events which led to Jack Pearson's death emerged. Petitioner told the detective that Pearson raped her the morning of December 18th and that he threatened to rape her again in the early morning hours of December 19th. (*Id*., Ex. 52 at 509, 504.) Petitioner claimed that when Pearson picked her up to take her upstairs to rape her, she hit him in the head with an unknown object. (*Id*., Ex. 52 at 504-05.) Petitioner

REPORT AND RECOMMENDATION - 4

indicated that she then hid in the dining room while Pearson tended to his head wound in a nearby bathroom. (Dkt. No. 74, Ex. 52 at 505.) Pearson then headed into the kitchen, swearing at petitioner has he walked over to the phone. (*Id*., Ex. 52 at 507.) Petitioner said she was scared and so went to the laundry room, got her gun, and then stood in the kitchen door where she could see what Pearson was doing. (*Id*., Ex. 52 at 507, 515.) Petitioner indicated that Pearson started running towards her from the telephone and she fired a shot intending only to injure him, not to kill him. (*Id*., Ex. 52 at 508.) Pearson then kept coming at her and she kept firing until he stopped. (*Id*., Ex. 52 at 512, 516.)

Following the January 14, 1998 interview, petitioner provided additional statements to the police containing more details about the alleged rape and the events surrounding Pearson's death. Despite petitioner's admission concerning her role in Pearson's death, charges were not filed against her until late 2000. On November 7, 2001, just before petitioner's trial got underway, the state filed a third amended information charging petitioner with one count of murder in the first degree murder (Count I), one count of felony murder in the second degree, with a predicate felony of assault in the second degree (Count II), and one count of theft in the first degree (Count III). (Dkt. No. 14, Ex. 2.) The information charged as well that petitioner was armed with a deadly weapon at the time of the commission of the murder. (*Id*.)

The evidence presented at trial revealed that when petitioner moved in with Pearson in 1991, it was with the understanding that she would not work outside the home because Pearson was retired and wanted her to share his retirement lifestyle. (Dkt. No. 74, Ex. 56 at 1070-71, 1183-85.) Petitioner gave up a job she enjoyed in order to accommodate Pearson's desire to have a companion who did not work. (*Id*., Ex. 56 at 1070.) While petitioner did not work outside the home, she had responsibilities around the home including cooking and cleaning and

taking care of the yard.  (*See* Dkt. No. 74, Ex. 56 at 1079.)  Pearson paid for all of the household

expenses and petitioner received a weekly allowance.  (*See id*., Ex. 56 at 1071-72.)  The

arrangement Pearson had with petitioner was similar to arrangements he had had with other

women in the past.  (*Id*., Ex. 50 at 20.)

During the six years they lived together, petitioner and Pearson, on several occasions, had

disagreements which led to discussions of petitioner moving out.  (*Id*., Ex. 56 at 1084-89.)  One

of those occasions was in the early morning hours of December 19, 1997 when Pearson told

petitioner to get out and told her she would have to get a new residence and a new job.  (*See id*.,

Ex. 56 at 1089-99.)  That was the morning Pearson was shot to death by petitioner.

At trial, petitioner asserted that she had acted in self-defense.  She testified that Pearson

had raped her on the morning of December 18th, and that he attempted to do so again in the early

morning hours of December 19th, after telling her to get out and get a job.[1]  (Dkt. No. 74, Ex. 56

at 1092-93, 1099-1102.)  According to petitioner, after Pearson told her to get out, she sat

downstairs and watched television with him before deciding to go upstairs to think things

through.  (*Id*., Ex. 56 at 1102.)  As she was heading for the stairs, Pearson grabbed her and the

two struggled and ended up in the laundry room.  (*Id*., Ex. 56 at 1102-03.)  Pearson told

petitioner he was going to do to her what he had done earlier and started tugging at her clothes.

(*Id*., Ex. 56 at 1104.)  Petitioner testified that, during the struggle, she picked up an object and hit

Pearson on the head in an effort to make him stop.  (*Id*., Ex. 56 at 1104-08.)  She further testified

that she could not recall what it was she hit him with.  (*Id*., Ex. 56 at 1106-07.)  The forensic

---

[1]  While petitioner testified that Pearson raped her the morning of December 18th, she also
testified that she and Pearson otherwise had a relatively normal day where they talked with each
other and she made him lunch.  (Dkt. No. 74, Ex. 56 at 1193-94.)  Petitioner also testified that
Pearson was not a violent person (*id*., Ex. 56 at 1185), that Pearson had never before had sex
with her against her will (*id*., Ex. 56 at 1196), and that "Jack would not rape anyone" (*id*., Ex. 56
at 1225).

pathologist who conducted the autopsy on Pearson described the blow to Pearson's head as significant, one that caused a laceration that was almost the full thickness of Pearson's scalp. (Dkt. No. 74, Ex. 53 at 582-85, 591.)

Petitioner testified that after she struck Pearson in the head, Pearson went into a nearby bathroom and got a towel. (*Id.*, Ex. 56 at 1109.) When petitioner heard Pearson turn the water off in the bathroom, she stepped into the dining room to hide. (*Id.*) According to petitioner's testimony, Pearson was enraged and went from the bathroom into the kitchen where he was "saying bad things." (*See id.*, Ex. 56 at 1112-15.) Petitioner moved back into the laundry room where she picked up a gun. (*Id.*, Ex. 56 at 1115.) Petitioner thereafter heard gunshots, but testified she did not actually remember pulling the trigger. (*Id.*) Petitioner subsequently left the Pearson house and ran to the neighbor's house.

The forensic pathologist identified five bullets wounds and recovered five bullets during the course of his autopsy of Pearson. (*Id.*, Ex. 53 at 578.) The pathologist testified that Pearson was shot once in the left wrist, three times in the left chest area, and once in the middle of his upper chest – a shot which severed Pearson's aorta. (*Id.*, Ex. 53 at 594-604.) It was subsequently determined that the bullets recovered from Pearson's body had been fired from petitioner's 38-special revolver which was found by police on the floor of the laundry room. (*See id.*, Ex. 50 at 76 and Ex. 54 at 775.)

In addition to claiming that she had acted in self-defense, petitioner also claimed at trial that she was in a dissociative state at the time of the shooting and therefore had limited capacity to form the intent necessary to assault or kill Jack Pearson. (*See id.*, Ex. 59 at 1781-82.) During her testimony, petitioner claimed on numerous occasions that she was having difficulty remembering details regarding the shooting despite having previously given detailed statements

REPORT AND RECOMMENDATION - 7

to the police.  Petitioner presented the testimony of Dr. Christian Harris to support her diminished capacity defense.  Dr. Harris testified that petitioner suffered from a dissociative disorder and that the dissociative state began at the time of the alleged rape in the early morning hours of December 19th, and ended three or four days later.  (Dkt. No. 74, Ex. 57 at 1354-56.) Dr. Harris further testified that inconsistencies in stories petitioner told during various interviews, as well as claimed memory lapses, were indicative of a dissociative disorder.  (*Id.*, Ex. 57 at 1381, 1385.)

Dr. Harris also testified that the dissociative disorder prevented petitioner from forming the requisite intent to commit the crimes charged in the third amended information.  Petitioner's counsel elicited Dr. Harris' opinion during the following exchange:

> [Defense Counsel]:  Were you able to come to an opinion as to whether or not Linda [Miley] would have been able to form the specific intent to cause – to kill somebody with premeditation at that time?
>
> [Dr. Harris]:  Yes, I reached an opinion.
>
> Q.  What was – what is that opinion?
>
> A.  That because of the major disintegration of mental functions and because of the disruption of her consciousness and awareness, she had a damaged ability to formulate specific intent.  A decreased ability to formulate specific intent.
>
> Q.  Okay. And decreased how?
>
> A.  Downward.
>
> Q.  Okay. How would that have any impact with her ability to form the intent to kill another person with premeditation?
>
> A.  It interrupts some of the neurocircuits that have to do with the ability to say, Okay, I'm going to take this object, and then I'm going to take this gun, and I'm going to shoot it, and I'm going to make sure you're dead by the time I'm done shooting you.
>
> She's not integrated during all of those behaviors as manifested by the consistency of her memory problems during that period.

Q. Were you able to reach an opinion as to whether or not she could form the intent to intentionally assault another person, specifically Mr. Pearson?

A. That's really a matter for the jury and the judge, but I'm merely saying that her mind, her brain, her mental functioning was below normal for Ms. Miley, and the reason it was was because of this major alteration of her consciousness by dissociative defenses.

Q. Okay. In your opinion, did that interfere with her ability to form the intent to assault Mr. Pearson?

A. Yes.

Q. In your opinion, did that interfere at all with her intent to take some money?

A. To rob?

Q. Yes.

A. Yes.

Q. We're talking about some money that was moved from one room to another.

A. Yes. It interfered with her ability to formulate these intents as well.

Q. Okay. And how so?

A. Same mechanism. A major interference with consciousness.

(Dkt. No. 74, Ex. 57 at 1362-64.) Dr. Harris did not offer any testimony regarding petitioner's capacity to act with lesser legal mental states; *i.e.*, knowingly or recklessly.

The jury began its deliberations on November 28, 2001, and on November 30, 2001, the jury returned a verdict of guilty of the lesser included offense of manslaughter in the first degree with respect to Count I of the third amended information, guilty of felony murder in the second degree as charged in Count II, and not guilty of theft as charged in Count III. (Dkt. No. 14, Ex. 3 at 1 and Ex. 9 at 1-2.) The jury also found that petitioner was armed with a deadly weapon. (*Id.*)

REPORT AND RECOMMENDATION - 9

On January 22, 2002, petitioner was sentenced in Island County Superior Court. (Dkt. No. 14, Ex. 3.) At that time, the sentencing court found that the manslaughter conviction merged with the second degree felony murder conviction and thus imposed no sentence on the manslaughter conviction. (*Id.*, Ex. 3 at 3.) The court imposed a sentence of 192 months on the second degree felony murder charge, as well as a mandatory 60 month term for the firearm enhancement, for a total sentence of 252 months confinement. (*See id.*, Ex. 3 at 1, 2 and 5.)

PROCEDURAL BACKGROUND

Petitioner appealed her judgment and sentence to the Washington Court of Appeals, Division I. (*Id.*, Exs. 4, 5, 6, 7 and 8.) On December 20, 2004, the Court of Appeals issued an unpublished opinion in which it reversed petitioner's second degree felony murder conviction and remanded the case to the Island County Superior Court for sentencing on the manslaughter conviction. (*Id.*, Ex. 9 at 6.) Petitioner moved for reconsideration, but her motions were denied. (*See id.*, Exs. 10 and 11.)

Petitioner next filed a petition for review in the Washington Supreme Court. (*See id.*, Exs. 12, 13, 14, 15, 16, 17, 18 and 19.) Petitioner's petition for review was denied without comment on November 2, 2005. (*Id.*, Ex. 20.) Petitioner then filed a "Motion for Revisory Jurisdiction," which was construed as a motion for reconsideration and was denied. (*Id.*, Exs. 21 and 22.) Petitioner subsequently filed a motion to modify which was placed in the court file without action. (*Id.*, Ex. 23.) On January 23, 2006, the Court of Appeals issued its mandate terminating direct review. (*Id.*, Ex. 24.) On October 16, 2006, petitioner filed a motion to recall the mandate, but that motion was denied on February 1, 2007. (*Id.*, Exs. 25 and 26.)

On January 27, 2006, the Island County Prosecuting Attorney moved to vacate petitioner's conviction for felony murder in the second degree pursuant to the mandate issued by

REPORT AND RECOMMENDATION - 10

the Court of Appeals.  (Dkt. No. 14, Ex. 27.)  On February 23, 2006, the Island County Superior Court granted the motion to vacate, and re-sentenced petitioner on the first degree manslaughter conviction to a total of 162 months confinement.  (*Id*., Exs. 1 and 28.)

Following her re-sentencing, petitioner filed an appeal in which she argued that her new sentence violated double jeopardy protections.  (*See id*., Ex. 29.)  The State filed a motion on the merits to affirm and, on October 26, 2006, the Court of Appeals Commissioner granted the motion.  (*Id*., Exs. 30 and 33.)  Petitioner moved to modify the Commissioner's ruling, but that motion was denied.  (*Id*., Exs. 34 and 35.)  Petitioner next filed a petition for review in the Washington Supreme Court.  (*Id*., Ex. 37.)  The Supreme Court denied review without comment on October 2, 2008.  (Dkt. No. 68, Ex. 40.)

In November 2009, petitioner filed a personal restraint petition in the Washington Court of Appeals.  (*Id*., Ex. 41.)  The Court of Appeals dismissed the petition on May 17, 2010.  (*Id*., Ex. 44.)  Petitioner thereafter filed a motion for discretionary review in the Washington Supreme Court.  (*Id*., Ex. 45.)  The Supreme Court Commissioner issued a ruling denying the motion for discretionary review on November 15, 2010.  (*Id*., Ex. 46.)  Petitioner's subsequent motion to modify was denied on February 2, 2011, and the Court of Appeals issued a certificate of finality in petitioner's personal restraint proceedings on April 13, 2011.  (*Id*., Exs. 47, 48, and 49.)

Petitioner originally filed this action in October 2006.  (*See* Dkt. No. 1.)  However, the action was stayed in August 2008 to allow petitioner to return to the state courts to exhaust some of her federal habeas claims which had not previously been fully and fairly presented to the state courts for review.  (*See* Dkt. No. 42.)  On February 28, 2011, the Court received from petitioner her second amended habeas petition which was accompanied by a notice advising that her state court proceedings had concluded.  (*See* Dkt. Nos. 59 and 60.)  The stay was lifted on March 3,

REPORT AND RECOMMENDATION - 11

2011 and respondent was directed to file an answer to the second amended petition.  (Dkt. No. 61.)  Respondent has filed her response to the second amended petition and has provided the Court with additional relevant portions of the state court record.  (*See* Dkt. Nos. 66, 68 and 74.)  Petitioner has filed a response to respondent's answer.  (Dkt. No. 70.)  The briefing is now complete, and this matter is ripe for review.

<u>GROUNDS FOR RELIEF</u>

Petitioner identifies the following twelve grounds for relief in her second amended petition:

**GROUND ONE:**      DOUBLE JEOPARDY.  The State violated the United States, Federal and State Constitutional Right of Protection Against Double Jeopardy.

**GROUND TWO:**      JURY INSTRUCTIONS.  The State violated the United States, Federal and State Constitutional Right to have the Court give fair and accurate jury instructions.

**GROUND THREE:**  INEFFECTIVE ASSISTANCE OF COUNSEL.  The United States Federal and State Constitutional Right to effective assistance of counsel was violated.

**GROUND FOUR:**      RIGHT TO PRESENT WITNESSES FOR DEFENSE.  The State violated Untied States, Federal and State Constitutional Right to allow Miley to Present Witnesses for her Defense.

**GROUND FIVE:**      UNREASONABLE SEARCHES AND SEIZURES.  The State Violated United States, Federal and State Constitutional Right to Expectation of Privacy by Warrantless Searches and Seizures in a private residence.

**GROUND SIX:**      PRESENTED EVIDENCE THAT WAS TAMPERED, TAINTED AND CONTAMINATED.  The State Violated United States, Federal and State Constitutional right to a Fair Trial and Due Process of Law.

REPORT AND RECOMMENDATION - 12

**GROUND SEVEN:**  PRESENTED FALSE AND ALLEGED CONFESSIONS/STATEMENTS.  The State Violated United States, Federal and State Constitutional Right to Due Process and a Fair trial.

**GROUND EIGHT:**  UNCONSTITUTIONAL OPINION EVIDENCE.  The State violated United States, Federal and State Constitutional Right to a Fair trial and Due Process of Law.

**GROUND NINE:**  PRESENTING PERJURED TESTIMONY AND BY ASSISTING IN THE GIVING OF DECEPTIVE TESTIMONY.  The State violated United States, Federal and State Constitutional Right to a Fair Trial and Due Process.

**GROUND TEN:**  UNRELIABLE AND INSUFFICIENT EVIDENCE.  The State violated Miley's United States, Federal and State Constitutional Right to Due Process and the right to a fair trial.

**GROUND ELEVEN:**  VIOLATION OF ATTORNEY/CLIENT AND DOCTOR/PATIENT PRIVILEGE.  The State Violated United States, Federal and State Constitutional Right to a Fair Trial, Due Process and the Right to Privileged Information between Attorney/Client and Doctor/Patient.

**GROUND TWELVE:**  ACTUAL AND SUBSTANTIAL PREJUDICE AND UNETHICAL MISCONDUCT OF THE PROSECUTOR.  The State Violated United States, Federal and State Constitutional Right to a Fair Trial, Due Process and the Right against prejudice and prosecutor misconduct.

(*See* Dkt. No. 59 at 11-18.)

DISCUSSION

Respondent concedes in her answer that petitioner has properly exhausted her state court remedies with respect to each of her twelve grounds for federal habeas relief.  Respondent argues, however, that petitioner is not entitled to relief with respect to any of the grounds asserted.

Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a habeas corpus petition may be granted with respect to any claim adjudicated on the merits in state court only if

REPORT AND RECOMMENDATION - 13

the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or if the decision was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d).

Under the "contrary to" clause, a federal habeas court may grant the writ only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal habeas court may grant the writ only if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *See id*. at 407-09. The Supreme Court has made clear that a state court's decision may be overturned only if the application is "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 69 (2003).

Clearly established federal law, for purposes of AEDPA, means "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Id*. at 71-72. "If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law." *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004) (citing *Dows v. Wood*, 211 F.3d 480, 485-86 (9th Cir. 2000)).

## Ground One: Double Jeopardy

Petitioner asserts in her first ground for relief that her rights under the Double Jeopardy Clause were violated when her case was remanded for sentencing on a first degree manslaughter charge after the Court of Appeals vacated her conviction on a second degree felony murder

charge. Petitioner was convicted at trial of first degree manslaughter and second degree felony murder for the death of Jack Pearson. At sentencing, the court found that the manslaughter conviction merged with the felony murder conviction and therefore sentenced petitioner only for the felony murder conviction. On appeal, the Washington Court of Appeals reversed the second degree felony murder conviction under *In re Personal Restraint of Andress*, 147 Wn.2d 602 (2002), and remanded the case to the trial court with instructions to enter judgment and sentence on petitioner's first degree manslaughter conviction. Petitioner contends that entry of the subsequent judgment and sentence violated her double jeopardy rights.

The Fifth Amendment to the United States Constitution guarantees that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. Amend V. The Double Jeopardy Clause protects against three distinct abuses: a second prosecution for the same offense after conviction, a second prosecution for the same offense after acquittal, and multiple punishments for the same offense. *Schiro v. Farley*, 510 U.S. 222, 229 (1994) (citing *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)). However, while the Double Jeopardy Clause protects a defendant against cumulative punishments for convictions on the same offense, it does not prohibit the State from prosecuting a defendant for such multiple offenses in a single prosecution. *Ohio v. Johnson*, 467 US 493, 500 (1984)

The Washington courts rejected petitioner's double jeopardy claim on direct appeal of both the original judgment and sentence and the second judgment and sentence. The Court of Appeals explained its conclusion with respect to petitioner's double jeopardy claim as follows:

> The double jeopardy clauses of the Fifth Amendment and article I, section 9 of the Washington Constitution prohibit multiple <u>punishments</u> for the same offense. Felony murder and intentional murder, or its lesser included crimes, of the same victim are alternative means of committing one offense, and are therefore the same offense for double jeopardy purposes. Miley's argument is correct that convicting and sentencing a defendant for both felony murder and

first degree manslaughter for a single homicide violates both state and federal guarantees against double jeopardy. [Footnote 4 omitted.] But that is not what happened in this case.

Miley was not convicted of and sentenced to both charges. Instead, the sentencing court entered judgment and sentenced Miley only on the felony murder charge. [Footnote 5: Miley's judgment and sentence contains four sections: Hearing, Findings, Judgment and order. In the findings, the court correctly recited that Miley was found guilty of both counts by jury verdict, and also stated that the special verdict for use of a firearm was returned on both counts. But in the judgment section, the court recognized that the two counts "merge[d]", that Count I (manslaughter) merges into Count II (felony murder) for sentencing purposes and specifically stated that it was not imposing sentence on Count I. The court sentenced Miley to 192 months on Count II and then added the deadly weapon enhancement for a total sentence of 252 months.] Although the sentencing court may have technically misused the term "merger" here, the court properly understood that felony murder and manslaughter are alternative means of committing one crime, and thus, there could be only one conviction for which punishment is issued. In State v. Johnson, [footnote 6 omitted] this court noted that the sentencing court's use of the term "merger" did not mean it necessarily committed error, even though the doctrine of merger did not apply. [Footnote 7 omitted.] The Johnson court held that the use of the term "merge[d]" was not to invoke the merger doctrine, but to create the effect of a merger resulting in only one conviction. [Footnote 8 omitted.] The Johnson court determined the trial court properly understood the alternative means of the two charges and convictions and, further recognized there could be only one punishment for the conviction. The same is true here. By sentencing Miley to one crime, the court acted appropriately and there was no double jeopardy violation because she did not receive multiple punishments. [Footnote 10: Johnson, 113 Wn. App. at 489. See Rutledge v. United States, 517 U.S. 292, 116 S. Ct. 1241, 134 L. Ed. 2d 419 (1996) (holding there is nothing novel about federal courts directing entry of judgment on one count where punishment on multiple counts violated double jeopardy); see also Ball, 470 U.S. at 865. Further, even trial defense counsel agreed that the court's position was appropriate. [Footnote 11 omitted.]

In Andress, our Supreme Court noted that the State could initiate any lawful proceedings that did not conflict with its decision after vacation of a defendant's felony murder conviction in order to prevent a defendant from benefiting from a windfall as a result of the sentencing error. This court will place Miley in the same position she would have been in had there been no error.

The underlying judgment set forth that Miley was convicted by a jury of manslaughter in the first degree as well as the felony murder conviction. However, because Miley was not punished for that conviction due to the verdict

and sentence on the felony murder charge, once that charge is vacated the remaining conviction is left for sentence. The case must be remanded to the lower court for entry of judgment and sentence on the conviction for manslaughter in the first degree.

(Dkt. No. 14, Ex. 9.)

The state courts reasonably concluded that there was no double jeopardy violation in petitioner's case because petitioner did not, in fact, receive multiple punishments for the same offense. Accordingly, petitioner's first ground for relief should be denied.

Ground Two: Jury Instructions

Petitioner asserts in her second ground for relief that the trial court erred when it refused to give a proposed defense instruction which would have extended the state law defense of diminished capacity to the mental states of negligence and recklessness. The trial court rejected the defense request for such an instruction on the grounds that defense counsel failed to lay a proper foundation for the instruction during his examination of the defense expert.

A claim of instructional error under state law is not a basis for federal habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). The question the federal habeas court must address when reviewing claims of instructional error in a state court trial is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). Where the challenge is to the failure to give an instruction, the petitioner's burden is "especially heavy" because "[a]n omission, or an incomplete instruction is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

The Court of Appeals rejected petitioner's claim of instructional error on direct appeal:

Miley asserts she was entitled to a diminished capacity instruction where manslaughter in the first degree, and therefore recklessness, was at issue.

REPORT AND RECOMMENDATION - 17

However, "[j]ury instruction are sufficient if they permit each party to argue his [or her] theory of the case and properly inform the jury of the applicable law."

The jury was instructed:

Evidence of mental illness or disorder may be taken into consideration in determining whether the defendant had the capacity to form premeditation and/or intent.

The court declined to give the instruction proposed by the defense which added the following language to the end of the above instruction, "whether the defendant acted recklessly or with negligence."

The trial court declined to give the additional language because it found that Dr. George Harris, Miley's expert, did not testify about the effect of diminished capacity on the mental state of recklessness and negligence. Rather, he confined his testimony to premeditation and intent.

To establish a diminished capacity defense, a defendant must produce expert testimony demonstrating that a mental disorder, not amounting to insanity, impaired his or her ability to form the culpable mental state to commit the crime charged. As noted by the trial court, Miley's expert opined that she could not form the intent to murder, assault or commit theft, but failed to offer an opinion regarding any lesser mental states, specifically any mental state necessary to commit a reckless or criminally negligent act. Therefore, the trial court did not err in refusing to give the expanded instruction.

(Dkt. No. 14, Ex. 9 at 5-6.)

Because the Washington Court of Appeals concluded that the trial court's refusal to give the expanded diminished capacity instruction was appropriate under state law, petitioner's challenge to the instruction provides no basis for federal habeas relief. Accordingly, petitioner's second ground for relief should be denied.

REPORT AND RECOMMENDATION - 18

<u>Ground Three:  Ineffective Assistance of Counsel</u>

Petitioner asserts in her third ground for relief that her trial counsel rendered ineffective assistance when he failed to lay the necessary foundation to support the inclusion of recklessness and negligence in the diminished capacity instruction discussed above.

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Claims of ineffective assistance of counsel are evaluated under the two-prong test set forth in *Strickland*.  Under *Strickland*, a defendant must prove (1) that counsel's performance was deficient and, (2) that the deficient performance prejudiced the defense.  *Strickland*, 466 U.S. at 687.

With respect to the first prong of the *Strickland* test, a petitioner must show that counsel's performance fell below an objective standard of reasonableness.  *Strickland*, 466 U.S. at 688.  Judicial scrutiny of counsel's performance must be highly deferential.  *Id*. at 689.   "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id*.  In order to prevail on an ineffective assistance of counsel claim, a petitioner must overcome the presumption that counsel's challenged actions might be considered sound trial strategy.  *Id*.

The second prong of the *Strickland* test requires a showing of actual prejudice related to counsel's performance.  In order to establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.  The reviewing Court need not address both components of the inquiry if an insufficient showing is made on one component.  *Id*. at 697.  Furthermore, if

both components are to be considered, there is no prescribed order in which to address them. *Strickland*, 466 U.S. at 697.

The Washington courts rejected petitioner's ineffective assistance of counsel claim in her personal restraint proceedings. The Washington Court of Appeals explained its decision as follows:

> Miley first argues that her trial counsel provided ineffective assistance in questioning defense expert witness Dr. Christian Harris, who testified at trial that Miley was in a dissociative state at the time of the killing and afterward, and therefore was unlikely to have been able to form the required intent to commit first degree murder, second degree murder, second degree assault as the predicate for felony murder, and first degree theft. The record shows that when defense counsel proposed a jury instruction on diminished capacity, the trial court declined to instruct the jury that Miley's diminished capacity defense would apply to first or second degree manslaughter because Harris had provided no testimony that Miley's dissociative state would have prevented her from achieving the necessary mental states of recklessness or criminal negligence that applied to those charges.
>
> Miley contends now that had counsel asked Dr. Harris additional questions, he would have testified that her ability to act recklessly or with criminal negligence also was impaired. She argues that there was no strategically justifiable reason to forgo asking the questions to support an instruction that also applied diminished capacity to the elements of first and second degree manslaughter. Miley points to the verdict, in which the jury did not find her guilty of first degree premeditated murder or second degree intentional murder, as proof that the jury would likely have acquitted her of manslaughter had the necessary foundation been laid for her proposed expanded instruction on diminished capacity.
>
> Miley's argument clearly fails in at least two respects. First, as the State argues, Miley failed to support this argument in her petition with a declaration or affidavit establishing that Dr. Harris would have testified in the fashion she now claims he would have. While Miley has now attempted to remedy that problem in an appendix to her reply to the State's response, this new evidence, coming for the first time in reply, is too late. See In re Pers. Restraint of Peterson, 99 Wn. App. 673, 681, 995 P.2d 83 (2000). Adhering to this rule is particularly important here, where Miley's reply comes well after the time-bar is in effect by even Miley's own view of the date when her conviction became final.

REPORT AND RECOMMENDATION - 20

Moreover, as the State alternatively argues, Miley's claim that the verdicts reached by the jury that she was prejudiced also clearly fails because she does not consider all of the verdicts the jury reached. Miley was convicted at trial of felony murder based on the predicate offense of a second degree assault against Pearson by the statutory means of intentional assault with a deadly weapon. In finding Miley guilty of felony murder, the jury necessarily did not find persuasive Dr. Harris's testimony that she lacked the ability to form the requisite intent to assault Pearson. Because criminal negligence and recklessness are lesser included mental states of intent, there is accordingly no reason to infer from the verdicts that there was any likelihood that they would have acquitted Miley of first or second degree manslaughter even assuming counsel had laid the necessary foundation for the expanded instruction on diminished capacity.

Miley therefore fails to make the required showing of prejudice. It is accordingly unnecessary to further analyze whether Miley's trial counsel provided deficient performance by failing to question Dr. Harris further. "The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." Strickland v. Washington, 466 U.S. 668, 697, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

(Dkt. No. 68, Ex. 44 at 4-6.)

The Washington Supreme Court Commissioner, in his ruling denying review, agreed with the analysis of the Court of Appeals, concluding that petitioner failed to show the Court of Appeals erred in finding there was no showing of prejudice arising out of any arguably deficient performance. The state courts applied the proper standard in evaluating petitioner's ineffective assistance of trial counsel claim and reasonably concluded that petitioner was not prejudiced by counsel's alleged deficient performance.

Petitioner also asserts in her third ground for relief that her appellate counsel rendered ineffective assistance by failing to raise the claim of ineffective assistance on direct appeal. The right to effective assistance of counsel on appeal arises out of the Fourteenth Amendment rather than the Sixth Amendment. *Martinez v. Court of Appeal of Calif.*, 528 U.S. 152 (2000). However, the applicable standard is the same; *i.e.* the *Strickland* standard set forth above. *Smith v. Robbins*, 528 U.S. 259, 285-6 (2000).

REPORT AND RECOMMENDATION - 21

The Court of Appeals rejected petitioner's ineffective assistance of appellate counsel claim in petitioner's personal restraint proceedings:

> Miley's related claim that her appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness also therefore fails for want of proof of prejudice. <u>In re Pers. Restraint Dalluge</u>, 152 Wn.2d 772, 777, 100 P.3d 279 (2004) (personal restraint petitioner claiming ineffective assistance of appellate counsel must show legal merit in the claim he contends appellate counsel should have raised).

(Dkt. No. 68, Ex. 44 at 6-7.)

Petitioner's failure to establish that trial counsel rendered ineffective assistance necessarily precludes her claim that appellate counsel rendered ineffective assistance. For the foregoing reasons, the entirety of petitioner's third ground for relief should be denied.

Ground Four:  Right to Present a Defense

Petitioner asserts in her fourth ground for relief that she was denied her right to present witnesses for her defense. Petitioner does not identify in her amended habeas petition the witnesses whom she believes were improperly excluded. However, the pleadings petitioner presented to the state courts make reference to two mental health experts, one who treated petitioner in Mississippi in the seventies and eighties, Dr. O'Brien, and one who treated petitioner following a suicide attempt in 2001, Dr. Bunselmeyer. The state courts summarily denied this claim on direct appeal.

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)) (internal citations omitted). Criminal defendants have the right "to present and have considered

REPORT AND RECOMMENDATION - 22

by the jury all relevant evidence to rebut the State's evidence on all elements of the offense charged." *Montana v. Egelhoff*, 518 U.S. 37, 41-42 (1996). The right to present a defense is, however, not absolute. *Id*. at 42. "The accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Id*. (quoting *Taylor v. Illinois*, 484 U.S. 400, 410 (1988)). A state court's decision to exclude evidence "must be so prejudicial as to jeopardize the defendant's due process rights." *Tinsley v. Borg*, 895 F.2d 520, 530 (9th Cir. 1990).

With respect to Dr. Bunselmeyer, the trial court ruled that any testimony from this proposed expert was irrelevant because it did not relate to petitioner's mental state at the time the crime at issue was committed. (*See* Dkt. No. 74, Ex. 55 at 1042-1045.) With respect to Dr. O'Brien, petitioner's counsel conceded that he did not have a good faith basis to pursue expert testimony from this witness, but he did wish to present Dr. O'Brien as an "event witness." (Dkt. No. 74, Ex. 57 at 1473.) The trial judge agreed that the proffered testimony of Dr. O'Brien was relevant and the evidence was ultimately presented to the jury by way of a stipulation. (*See id.*, Ex. 57 at 1473-1476 and Ex. 58 at 1535.)

As the record makes clear that Dr. Bunselmeyer was precluded from testifying because the testimony he would have offered was irrelevant to the issues to be decided, and that Dr. O'Brien was not, in fact, precluded from testifying, the state courts' denial of petitioner's claim that she was denied her right to present witnesses in her defense was not objectively unreasonable. Accordingly, petitioner's fourth ground for relief should be denied.

<u>Ground Five: Unreasonable Search and Seizure</u>

Petitioner asserts in her fifth ground for relief that her right to be free from unreasonable searches and seizures was violated. More specifically, petitioner appears to complain about

rulings made by the trial court during a pretrial suppression hearing that certain warrantless entries and/or searches of petitioner's residence were valid and legal, and that the seizure of certain of petitioner's personal effects was proper under a validly issued warrant.

A Fourth Amendment claim is not cognizable in a federal habeas proceeding if a petitioner has had a full and fair opportunity to litigate the claim in state court. *Stone v. Powell*, 428 U.S. 465, 481-82 (1976). The relevant inquiry is whether the petitioner was afforded a full and fair hearing, not whether the state court reached a correct resolution. *See Siripongs v. Calderon*, 35 F.3d 1308, 1321 (9th Cir. 1994)(defendant had a full and fair opportunity where he made his Fourth Amendment argument in both state trial and appellate courts), *cert. denied*, 115 S.Ct. 1175 (1995). The record before this Court reveals that petitioner, in fact, had a full and fair opportunity to litigate her Fourth Amendment claim in the state courts. Accordingly, petitioner's fifth ground for relief should be denied.

<u>Grounds Six: Presentation of Evidence</u>

Petitioner asserts in her sixth ground for relief that her right to a fair trial was violated when evidence that had been "tampered, tainted, and contaminated" was admitted at trial. In her statement of supporting facts, petitioner references an interview between her and an investigating detective that occurred on April 9, 1999. Petitioner contends that the state took a video/audio tape of that interview, edited the tape, and then substituted it for the original and played it for the jury "as a statement/confession." Petitioner also references in her statement of facts physical evidence which was removed from the crime scene by local police officers and which she appears to contend was tampered with while it was in the custody of the sheriff's department. The state courts summarily denied petitioner's claim(s) regarding tampered evidence on direct appeal.

It is not the province of federal habeas courts to re-examine state court conclusions regarding matters of state law. *Estelle v. McGuire*, 502 U.S. 62 (1991); *Jeffries v. Blodgett*, 5 F.3d 1180, 1192 (9th Cir. 1993), *cert. denied*, 510 U.S. 1191 (1994). State court evidentiary rulings are not subject to federal habeas review unless such rulings "violate[] federal law, either by infringing upon a specific constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process." *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995). *See also*, *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991); *Hamilton v. Vasquez*, 17 F.3d 1149, 1159 (9th Cir. 1994).

Petitioner's first contention, that an edited version of the tape of the April 9, 1999 interview was substituted for the original and played for the jury, is not supported by the record. At the pretrial suppression hearing held in August 2001, the defense challenged the adequacy of the *Miranda* warnings given to petitioner at the April 9, 1999 interview. The parties stipulated that the only portion of the rather lengthy videotape of that interview that need be admitted for purposes of the suppression hearing was the portion containing the *Miranda* warnings. (*See* Dkt. No. 21, Ex. 39 at 131-32 and Ex. 40 at 333-34.) Thus, while the entire original tape was offered and admitted at the hearing, a substitute videotape containing only the *Miranda* warnings was subsequently admitted. (*See id*.) The entire, unedited version of the tape was played for the jury at trial.

Petitioner also contends that physical evidence was tampered with. However, that assertion is conclusory and is not supported by any facts in the record. Petitioner fails to demonstrate that any evidence was, in fact, tampered with or that the admission of any of the challenged evidence violated her right to a fair trial. The state courts therefore reasonably

rejected the claim on direct appeal. Accordingly, petitioner's sixth ground for relief should be denied.

<u>Ground Seven: Voluntariness of Confession</u>

Petitioner asserts in her seventh ground for relief that her right to a fair trial was violated when police officers used a "ruse," and took advantage of her mental state, in order to obtain statements/confessions from her which were admitted at trial. The Washington courts summarily denied petitioner's challenge to the voluntariness of her statements/confessions on direct appeal.

A determination regarding the voluntariness of a confession must be based upon an evaluation of the totality of the circumstances. *See Arizona v. Fulminante*, 499 U.S. 279, 285-86 (1991). This inquiry examines "whether a defendant's will was overborne in a particular case" and takes into consideration "both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). In *Colorado v. Connelly*, 479 U.S. 157 (1986), the Supreme Court made clear that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Id.* at 167. The Supreme Court has also made clear, however, that strategic deception is constitutionally permissible: "Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda's* concerns." *Illinois v. Perkins*, 496 U.S. 292, 297 (1990).

Petitioner fails to clearly explain in these proceedings the precise nature of the alleged "ruse." However, as noted above, it is coercive tactics which implicate constitutional concerns not deceptive tactics. Thus, to the extent petitioner contends police officers engaged in deceptive tactics, she has not stated a viable ground for federal habeas relief. Petitioner also fails to

REPORT AND RECOMMENDATION - 26

demonstrate that police engaged in any coercive activity in obtaining her statements/confessions. To the contrary, the record demonstrates that petitioner exhibited a willingness to speak to police throughout the course of their lengthy investigation and even initiated the contact with police on some occasions. Absent any showing of coercive activity, petitioner's statements/confessions must be deemed voluntary. Thus, the state courts' denial of this claim was not objectively unreasonable.

Petitioner also challenges in her seventh ground for relief a limiting instruction provided in conjunction with the testimony of Dr. Harris, petitioner's mental health expert. Immediately after Dr. Harris was sworn, the trial judge instructed the jury that out-of-court statements made to Dr. Harris could only be considered for the limited purpose of providing a basis for Dr. Harris' opinion and not for the truth of the statements made to Dr. Harris. (Dkt. No. 74, Ex. 57 at 1314.) The Washington Court of Appeals, in petitioner's personal restraint proceedings, determined that the instruction was proper:

> The instruction she cites . . . was simply a form of limiting instruction properly given whenever an expert testifies on the basis of hearsay or other otherwise inadmissible evidence that is admitted only for the limited purpose of providing a basis for the expert's opinion. See In re Det. Of Marshall, 122 Wn. App. 132, 144-45, 90 P.3d 1081 (2004). When evidence is admitted for such a limited purpose, the court must give a proper limiting instruction upon the request of the party against whom the evidence is admitted. State v. Freeburg, 105 Wn. App. 492, 501, 20 P.3d 984 (2001).

(Dkt. No. 68, Ex. 44 at 6.)

As the state courts concluded the instruction was proper under state law, petitioner's challenge to the instruction provides no basis for federal habeas relief. *See Estelle v. McGuire*, 502 U.S. at 67-68. For the reasons set forth above, petitioner's seventh ground for relief should be denied in its entirety.

REPORT AND RECOMMENDATION - 27

## Ground Eight:  Admission of Opinion Evidence

Petitioner asserts in her eighth ground for relief that her right to a fair trial was violated when Detective Clark improperly provided opinion testimony.  Petitioner's explanation of this claim is not especially clear.  However, she cites to testimony by Detective Clark that something petitioner had allegedly said was "over the top" and was a reason for focusing on her as a suspect.  Petitioner also cites to the videotape of the April 9, 1999 interview by Detective Clark in which he expressed unspecified opinions.  Finally, petitioner cites to a computer animation used by the prosecutor during trial which she apparently believes reflected the prosecutor's opinion of what had likely occurred on the night of the crime.

While a witness is not permitted to give a direct opinion about the guilt or innocence of the defendant, *Moses v. Payne*, 555 F.3d 742, 761 (9th Cir. 2009), petitioner does not identify any such opinions in her federal habeas petition.  Petitioner also fails to establish that the challenged evidence rendered her trial fundamentally unfair.  *See Walters v. Maas*, 45 F.3d at 1357.  Accordingly, petitioner's eighth ground for relief should be denied.

## Ground Nine:  Presentation of False Testimony

Petitioner asserts in her ninth ground for relief that the state violated her right to a fair trial by presenting perjured testimony and by assisting in the giving of deceptive testimony.  Petitioner specifically references testimony from Detective Clark, which petitioner claims was inaccurate, about the number of interviews he conducted with petitioner after the January 1998 re-enactment.  Petitioner also references testimony concerning the location of the gunshots on the victim.  Specifically, petitioner contends that the state allowed testimony that the victim was shot in the back when all of the supporting evidence proved that there was no shot in the back.  The state courts summarily denied this claim on direct appeal.

It is well established that a conviction obtained by the knowing use of false evidence is fundamentally unfair, and that such a conviction may not stand under the Fourteenth Amendment if there is any reasonable likelihood that the false testimony affected the judgment of the jury. *Napue v. Illinois*, 360 U.S. 264, 269 (1950). *See also*, *United States v. Agurs*, 427 U.S. 97, 103 (1976). Petitioner, however, makes no showing whatsoever that the prosecutor knowingly solicited any false testimony during the course of petitioner's trial.

With respect to the testimony concerning the number of interviews conducted by Detective Clark, the record reflects that that testimony was given during the pretrial suppression hearing. (*See* Dkt. No. 21, Ex. 39 at 129.) Because of the context in which the testimony was presented, regardless of the truth or falsity of the testimony, there is no reasonable likelihood that the testimony affected the judgment of the jury. Likewise, with respect to the location of the gunshots, Detective clark testified at the pretrial suppression hearing that there was a gunshot wound to the back. (*See* Dkt. No. 21, Ex. 39 at 75.) However, petitioner does not specifically identify any testimony during the trial stating that the victim was shot in the back. Moreover, given that the jury found petitioner guilty of recklessly shooting the victim and not intentionally killing him, there is no reasonable likelihood that the testimony regarding the location of the gunshot wounds affected the verdict in a manner adverse to petitioner. The state courts' denial of this claim was not objectively unreasonable and, thus petitioner's ninth ground for relief should be denied.

Ground Ten: Sufficiency of the Evidence

Petitioner asserts in her tenth ground for relief that there was insufficient evidence to support the jury's verdict because (1) the prosecution failed to prove its "lining up the angles

theory," (2) petitioner had a strong case of self-defense, and (3) the alleged confessions were false, inaccurate, and the product of psychological coercion and deceptive tactics by the police.

The Due Process Clause of the Fourteenth Amendment requires that the prosecution prove beyond a reasonable doubt each element of the charged offense. *Carella v. California*, 491 U.S. 263, 265 (1989)(citing *In re Winship*, 397 U.S. 358, 364 (1970)). When evaluating a claim of insufficiency of the evidence, a reviewing court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This standard is "'highly deferential' to the jury's findings." *United States v. Bancalari*, 110 F.3d 1425, 1428 (9th Cir. 1997).

The Washington Court of Appeals rejected petitioner's sufficiency of the evidence claim in her personal restraint proceedings:

> Miley next raises a series of claims she characterizes as going to sufficiency of credible evidence to convict. A challenge to the sufficiency of the evidence admits the truth of the State's evidence and any reasonable inferences drawn from it. <u>State v. Salinas</u>, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). . . . This court reviews the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. <u>Salinas</u>, 119 Wn.2d at 201.
>
> Pearson was shot five times. After initially telling police that a masked intruder was responsible, Miley said she had shot Pearson intending to injure him, not kill him, because she was acting to defend herself from his attempt to rape her. There was, however, substantial evidence to reject Miley's self-defense claim. The evidence therefore was plainly sufficient to support an inference that Miley acted with at least criminal recklessness in causing Pearson's death. See RCW 9A.32.060(1)(a) ("A person is guilty of manslaughter in the first degree when . . . He recklessly causes the death of another person[.]")

(Dkt. No. 68, Ex. 44 at 7-8.)

REPORT AND RECOMMENDATION - 30

The state courts applied the proper standard in evaluating petitioner's sufficiency of the evidence claim and reasonably concluded that there was sufficient evidence to support her conviction. This Court, having reviewed the entirety of the transcript of petitioner's trial, concurs that there was substantial evidence to, at the very least, support the jury's verdict on the first degree manslaughter charge. Accordingly, petitioner's tenth ground for relief should be denied.

Ground Eleven: Privilege

Petitioner asserts in her eleventh ground for relief that her right to confront witnesses was violated when the trial court allowed Michael Lewis, the attorney for the victim's estate, to invoke the attorney/client privilege to certain questions posed by petitioner's trial counsel.

The Confrontation Clause of the Sixth Amendment secures for the criminal defendant the right to cross-examine a witness against him in order to test the believability of the witness. *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974). However, the right to cross-examination is not without limits. Trial courts have broad discretion to impose limits on cross-examination, based on evidentiary concerns such as those embodied in the Federal Rules of Evidence, including relevancy, harassment, prejudice, delay, duplicity, or confusion of the issues. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)) (emphasis in original).

The Washington Court of Appeals, in petitioner's personal restraint proceedings, rejected her claim that she was denied her right of confrontation when the trial court upheld a claim of privilege by the attorney for Pearson's estate, Michael Lewis:

REPORT AND RECOMMENDATION - 31

As for Lewis, the attorney in [sic] Pearson's estate, Miley's attorney sought to cross-examine him regarding conversations he had with one of Pearson's children about a civil suit she says was filed to prevent her from claiming an interest in Pearson's property. Miley cites no relevant authority supporting her claim, but argues that the court erred by holding that the privilege had not been waived or breached when the State called the attorney as a witness. Her claim clearly fails as the State clearly was not Mr. Lewis's client and therefore could not waive the privilege by calling him. See RCW 5.60.060(2)(1), which provides: "An attorney or counsellor shall not, without the consent of his or her client, be examined as to any communication made by the client to him or her, or his or her advice given thereon in the course of professional employment." (emphasis added). While the privilege is not absolute, Miley has provided no authority or reasoned argument showing why her right to confrontation required the trial court to invade the privilege under the circumstances present in her case. Moreover, as the State contends, given that Miley was acquitted of the theft count, she has made no prima facie showing of prejudice in any event.

(Dkt. No. 68, Ex. 44 at 8-9.)

Petitioner offers nothing in these proceedings to demonstrate that the trial court erred in allowing Mr. Lewis to invoke the attorney-client privilege or that, in any event, she was prejudiced by the limitation on the cross-examination of Mr. Lewis. The state courts therefore reasonably rejected this claim.

Petitioner also contends that her attorney/client and doctor/patient privileges were violated when the trial court ordered that documents which were produced at the request of her attorney, including a life history prepared by petitioner, medical records, and other privileged information, be provided to the prosecution.

The Washington Court of Appeals rejected petitioner's claim that the trial court erred in denying her claim of privilege with respect to the autobiographical history she prepared for Dr. Harris's use in formulating his expert opinion:

As for the claim that Miley's rights to doctor-patient or attorney-client privilege were violated, the record shows that Miley prepared the document for use by Dr. Harris in formulating his opinion and testifying in her defense at trial. Miley accordingly waived both the physician-patient privilege and attorney-client privilege, and further waived the right to broadly invoke the privilege against self-

incrimination in those materials.  See State v. Hutchinson, 135 Wn.2d 863, 877-78, 959 P.2d 1061 (1998); State v. Hamlet, 133 Wn.2d 314, 319-20, 944 P.2d 1026 (1997).

While, under Hutchinson, the trial court is required to act as a gatekeeper to prevent admission of directly incriminating statements, see State v. Cochran, 102 Wn. App. 480, 484, 8 P.3d 313 (2000), Miley has provided only a broad assertion that the "life history" she prepared for Dr. Harris should have been excluded in its entirety.  See personal restraint petition at 37-38.  Miley has made no showing that any material that should have been properly excluded as part of that gatekeeper function for directly incriminating materials was actually provided by [sic] the State.  Rather, it appears that what the State received was the type of material for which the privilege was waived and which the trial court had authority to required [sic] to be disclosed in discovery as part of the foundation for Dr. Harris's expert testimony.  See State v. Russell, 125 Wn.2d 24, 73-75, 882 P.2d 747 (1994) (construing ER 705, which provides court authority to require an expert to provide prior disclosure of the underlying facts or data); see also, State v. Ellis, 136 Wn.2d 498, 522-23, 963 P.2d 843 (1998) (ER 702) (admissibility of expert testimony regarding diminished capacity determined under the rules of evidence).

(Dkt. No. 68, Ex. 44 at 9-10.)

As respondent correctly points out, the claimed privileges are state law privileges and not rights arising under the constitution.  Moreover, the Court of Appeals concluded that, as a matter of state law, the trial court properly required disclosure of the materials at issue here.  As this claim does not implicate federal constitutional concerns, petitioner has not asserted a cognizable ground for federal habeas relief.  For the foregoing reasons, petitioner's eleventh ground for relief should be denied in its entirety.

Ground Twelve:  Prosecutorial Misconduct

Petitioner asserts in her twelfth ground for relief that the prosecutor engaged in misconduct and caused substantial prejudice.  The state courts summarily denied this claim on direct appeal.

REPORT AND RECOMMENDATION - 33

1    When a prosecutor's conduct is placed in question, the standard of review is the "narrow

2    one of due process, and not the broad exercise of supervisory power." *Donnelly v.*

3    *DeChristoforo*, 416 U.S. 637, 642 (1974). This Court cannot issue a writ of habeas corpus to

4    state authorities unless the prosecutor's conduct "so infected the trial with unfairness as to make

5    the resulting conviction a denial of due process." *Id.* at 643; *Darden v. Wainwright*, 477 U.S.

6    168, 181 (1986). In order to assess a claim that a prosecutor's comments constitute a due process

7    violation, it is necessary to examine the entire proceedings and place the prosecutor's statements

8    in context. *See Greer v. Miller*, 483 U.S. 756, 765-66 (1987). The court must keep in mind that

9    during closing argument a prosecutor has wide latitude to make reasonable inferences based on

10   the evidence. *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991). Nonetheless,

11   habeas relief can be granted if the prosecutor's improper comments "had substantial and injurious

12   effect or influence in determining the jury's verdict." *Jeffries v. Wood*, 75 F.3d 491, 494 (9th Cir.

13   1996) (*quoting O'Neal v. McAninch*, 115 S. Ct. 992 (1995); *Brecht v. Abrahamson*, 507 U.S.

14   619, 637 (1993)).

15       Petitioner first contends that the state included an erroneous and prejudicial charge in the

16   original charging document. However, the charges were subsequently amended and petitioner

17   was convicted under the third amended information. Petitioner fails to demonstrate that any

18   error in the original charging document caused her any actual prejudice. Petitioner also contends

19   that the prosecutor made numerous statements during closing argument that were not supported

20   by the evidence and that the prosecutor impugned defense counsel's integrity. Petitioner fails,

21   however, to specifically identified the allegedly improper comments. Petitioner also fails to

22   demonstrate that any allegedly improper comments caused her prejudice. Finally, petitioner

23   contends that the prosecutor raised objections to every expert she sought to call and then

REPORT AND RECOMMENDATION - 34

discredited the testimony of the one expert allowed by obtaining a limiting instruction prior to his testimony. However, as discussed above, neither the prosecutor's objections to the proposed experts nor the request for the limiting instruction were improper. The state courts reasonably rejected this claim on direct appeal and, thus, petitioner's twelfth ground for relief should be denied.

Certificate of Appealability

A petitioner seeking post-conviction relief under § 2254 may appeal a district court's dismissal of his federal habeas petition only after obtaining a certificate of appealability (COA) from a district or circuit judge. A certificate of appealability may issue only where a petitioner has made "a substantial showing of the denial of a constitutional right." See 28 U.S.C. § 2253(c)(3). A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Under this standard, this Court concludes that petitioner is not entitled to a certificate of appealability with respect to any of the twelve claims for relief asserted in her second amended petition for writ of habeas corpus.

//
//
//
//
//
//
//

## CONCLUSION

For the reasons set forth above, this Court recommends that petitioner's second amended petition for writ of habeas corpus be denied and that this action be dismissed with prejudice. This Court further recommends that a certificate of appealability be denied with respect to all claims asserted in the second amended petition.  A proposed order accompanies this Report and Recommendation.

DATED this 6th day of January, 2012.

_____
JAMES P. DONOHUE
United States Magistrate Judge

REPORT AND RECOMMENDATION - 36